## Peter Gardner, alias Garner, v. The State.

### No. 2694.    Decided March 18, 1903.

**1.—Murder—Charge—Manslaughter.**

On a trial for murder, where it appeared that the parties had not known each other, that deceased and another party both assailed defendant, caught hold of him and had him bent and pushed down on the sidewalk so he could not secure his release, when defendant drew his pistol and fired. Held, the court erred in refusing to charge upon manslaughter.

**2.—Same—Homicide from Disease and Not the Wound—Charge.**

On a trial for murder, where it appeared that after deceased was shot by appellant, and his arm amputated, it was ascertained by the attending physicians that he was in the last stages of Bright's disease, and that his death was caused by paralysis of the kidneys, inducing blood poison, through the use of chloroform administered at the time his arm was amputated; Held, if deceased would shortly have died from Bright's disease, an incurable malady, and defendant's shot assisted in bringing about the death, defendant would be guilty of the homicide, and it was not error to refuse to instruct the jury to acquit if such disease produced the death.

Appeal from the Criminal District Court of Galveston. Tried below before Hon. J. K. Gillaspie.

Appeal from a conviction of murder in the first degree; penalty, death.

The indictment charged appellant with the murder of Frank Boenig, on the 20th day of December, 1902, by shooting him with a pistol.

The important facts connected with the shooting and death of deceased are stated in the opinion.

*Marsene Johnson,* for appellant.—The court erred in refusing to give defendant's requested instruction on manslaughter. Abrams v. State, 40 S. W. Rep., 798; Williams v. State, 7 Texas Crim. App., 396; McKinney v. State, 8 Texas Crim. App., 626; Burnett v. State, 12 Texas Crim. App., 521; Reddick v. State, 47 S. W. Rep., 994; Brande v. State, 45 S. W. Rep., 17; Balltrip v. State, 30 Texas Crim. App., 545; Jones v. State, 29 Texas Crim. App., 338; Meuly v. State, 26 Texas Crim. App., 274.

The court erred in refusing to give defendant's special requested instruction as to death caused by disease and not the wound inflicted by defendant. Morgan's case, 16 Texas Crim. App., 593; Franklin's case,

51 S. W. Rep., 951, 953; Johnson's case, 65 S. W. Rep., 93; Penal Code, art. 652.

*Howard Martin,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at death.

There are no bills of exception, and the case will be treated from the standpoint of the motion for new trial. The special charge requested by appellant on manslaughter was refused, and the court did not give a charge on this subject. This is assigned as error. Appellant took the stand in his own behalf, and among other things states that, as he was passing a bakery en route home from his work at the close of the day, he bought a nickel's worth of cakes, and began eating them. He heard the baker order him to move away from the place where he was standing—he was leaning against a glass show case outside the building. He replied that he was not going to steal anything. Directly afterwards deceased, Boenig, came out of the shop, and shoved appellant with the show case, and appellant asked him not to shove the show case on top of him, and he (Boenig) called appellant "a son of a bitch." Appellant replied in similar language. Boenig then ran toward appellant, and Goettloeb (the owner of the bakery) ran out, and both caught hold of appellant, and had him bent down, and pushed him down the sidewalk and across the sidewalk towards Cook's store. Appellant requested them to let him loose, and drew his pistol. They both had hold of appellant so he could not secure his release, and it was then that he fired his pistol. He had never before seen deceased, and had no ill feeling toward him. He had not used any profane language toward deceased until he called him a "son of a bitch" in reply to Boenig's similar epithet applied to him. Deceased was a much larger and stronger man than appellant. Garrison testified that he was sitting at his store, which is across the street from the difficulty, and heard some words between appellant and deceased, but could not distinguish what was said; that he saw deceased push defendant from him towards the edge of the sidewalk, and saw defendant reach back and get a pistol. Deceased ran on defendant, and just as he did the gun fired. Williams testified that he was in Cook's store, and saw three or four men fighting on the sidewalk, and fall in the doorway about twenty feet away, and after they were down heard a pistol shot, and thought they were all white men until he saw appellant being taken to jail; that the shot was not fired until the man had fallen in one of Cook's doorways. To the same effect was the testimony of Daniels and Victoria Thomas. We have stated enough of the evidence to make it apparent that manslaughter was decidedly an issue in this case.

The court gave an instruction to the effect that the destruction of life must be complete by the acts, agency, procurement, or culpable omission on the part of appellant, in accord with article 652, Penal

Code 1895. Appellant asked in this connection an instruction to the effect that if deceased was shot, but the wound thereby inflicted was not necessarily fatal, and the wounded party was suffering from or afflicted with a disease not connected with or superinduced by the shot, and died therefrom, then appellant should be acquitted altogether of any grade of homicide. This charge was refused. In regard to this matter Dr. Ruhl testified that deceased died in Galveston County, on Monday, December 22, 1902, about 4:30 o'clock p. m., in St. Mary's Hospital; that he died from uræmia, acute nephritis, which, being interpreted into ordinary English, means Bright's disease in its last stages; deceased was shot in the right arm, breaking the elbow, and it became necessary to amputate the arm, which was done shortly after the patient reached the hospital, late Saturday evening; that he lived about forty-five hours after the operation; that the operation was necessary, and it was further necessary in performing this operation to administer chloroform; that the effect of chloroform was to paralyze the kidneys, and to render it impossible for them to perform their natural functions and throw off the impurities of the urine, and failing to do that these impurities got into the blood and poisoned the system; there was no autopsy performed on the body after death; that the patient died of "acute nephritis." He further testifies: "I first noticed the symptoms on the day after I had operated on his arm. The patient developed no symptoms of coma until Sunday evening, and from that time until his death, which occurred Monday evening, about 4:30, he was in a comatose condition." Dr. Starley testified that the patient was placed under the influence of chloroform, which was necessary in order to perform the surgical operation to remove portions of the elbow joint. The investigation in regard to the condition of deceased's urine did not occur until Sunday evening, after the operation on Saturday evening. So it may be conceded that the immediate cause of the death was Bright's disease. Briefly summed up, this testimony showed that deceased was in the last stages of Bright's disease; his elbow broken by a pistol shot; chloroform administered for the purpose of surgical operation; the kidneys paralyzed by means of the chloroform, and failing to perform their functions, threw uric acid back upon the system by poisoning the blood, thereby causing death. The physicians also testified, in this connection, that this was proper treatment under the peculiar circumstances, and that the operation was a necessity. Whether the life of deceased could have been saved by some other means than the operation, or whether there was negligence in this connection or improper treatment in not investigating the condition of appellant's kidneys prior to the operation, does not seem to have entered into the testimony. A charge was given, as before stated, in accordance with article 652, Penal Code 1895, as to negligence or improper treatment of others than appellant in bringing about the death of deceased. So we have, as presented by the failure of the court to give the requested instruction, the proposition that, if deceased was suffering from or afflicted with a disease not connected with

or superinduced by the shot, appellant would not be guilty of the homicide, if such disease produced death. We do not believe this charge is correct. If deceased was suffering from a disease or a wound, and appellant's shot hastened the death of deceased, he would be guilty of the homicide. If deceased would have shortly died from Bright's disease, and it was an incurable malady, yet if appellant's shot assisted in bringing about the death, he would be guilty of the homicide. An accused can not speculate as to how long his victim may life with an incurable malady when he inflicts a shot or a wound that hastens the death or the action of the fatal disease. The court did not err in refusing the special instruction.

For the error discussed in failing to charge on manslaughter, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Henderson, Judge, absent.